Good morning. May it please the court, my name is Kimberly Hunter. I am here today on behalf of Mr. Abdifatah Abdi Omar. Several of his family members are also present in the courtroom today. I would note that Mr. Omar himself has been deported to Somalia about approximately one year ago and he is living there in hiding where he remains today. Well, that's probably not in the record, is it? That is true. All right. Well, let's stick to that. All right. In terms of the record, returning to that, the part of this case that is undisputed is, of course, the fact that the court has de novo jurisdiction to consider his legal challenges to the legal errors committed by the board in its review of the IJ's decision, the immigration judge's decision. That's under Waldron. That also includes predictive findings of fact about what will occur in the future under matter of ZZO. However, here the board did not apply that level of review and instead engaged in its own fact finding and also supplanted the IJ's findings of fact with some of its own findings. Furthermore, they failed to apply clear error review to the IJ's factual findings. Are there some preliminary jurisdictional issues here? There are preliminary jurisdictional issues, Your Honor. I will address those briefly if I may because I think that the undisputed part would be the legal challenges. But I would note that, secondly, even if we are to accept the government's argument that this is a fact-based challenge, then that goes to our motion to hold an abeyance under Nasrallah because Nasrallah is currently at the Supreme Court, has been accepted for certiorari, and will therefore be argued later this session. And so if, in fact, we are to look at the fact-based review, a review for error, then the Nasrallah case would factor into that. Are you looking for me to address the initial other jurisdictional issues? Well, you want to focus on what you think survives even if the government is right on its jurisdictional arguments. You mean the legal issue about the CAT claim? That's correct, Your Honor. All right. Go ahead. You may proceed on that. Thank you. I think the most critical error, perhaps, the Board may have made is that they failed to aggregate the risk of torture to Mr. Abdi Omar. The immigration judge engaged in a very individualized determination that his clan and his HIV-positive status both would impact his risk of torture in Somalia. It's very clear in the case law that the aggregate risk of torture is also what is to be considered. However, the government in its underlying briefing, and its briefing today, has tried to disaggregate the case into three parts. First, the risk of torture due to his clan. Second, the risk of torture due to HIV status. And third, his ability to safely relocate to Mogadishu. Again, the government wishes to cast these errors as factual disputes, but they clearly are legal errors under, excuse me, they should not survive clear error or de novo review at this panel. For example, in page four of the administrative record, the Board of Immigration Appeals reviews the government's argument as to whether or not Mr. Abdi Fattah, Abdi Omar, is a member of a particular clan. The Board found that he is, in fact, a member of the clan called the Baguetti, and the immigration judge in making that finding largely relied upon the credible testimony of my client, as well as his mother. It's clear under the regulations that credible testimony from witnesses can carry the day in a CAT claim, and that's under 8 CFR 1208.16c. However, in that same page, the Board goes on to say that they failed to provide evidence that the Baguetti did not receive protection from other clans. It is our position that it's clear error to credit the testimony of Mr. Abdi Omar and his mother with regard to clan membership, and then somehow turn around and discredit when it comes to the issue of the Baguetti clan in relationship with two other clans. I would also note that the administrative record at page 329 notes the positioning of the clan structure in Somalia and notes numerous sub-clans and other related groups. If, in fact, we were to follow the Board and somehow be required to provide specific evidence with relationship to the Baguetti clan and its ability to protect itself, I would submit that that is an impossibility based upon the ongoing state of civil war and strife in Somalia. What about the later comment that if you can relocate to Bogadishu, then that city has little clan violence and discrimination? And again, Your Honor, that is this disaggregated analysis that is clearly erroneous. The judge considered both his clan membership and his HIV status in making her decision that he would face torture wherever he went in Somalia. I think here the BIA, I understand their structure doesn't say it maybe clearly. I think here they're aggregating them together. They're taking the clan from two paragraphs before and putting it together with the relocation. I'm sorry, correct. They may well be, and again, that would be erroneous because the IJ's finding is it is his clan membership exacerbated by his HIV status, which renders him subject to torture and unable to locate within Somalia. So I would point at the Kamara case from the Third Circuit, which talks about probabilities related to torture. And there there were two primary actors that were at play or at risk of being torturers for that respondent. The Third Circuit in its review basically weighed the risk of torture from one actor and the other in concluding that the respondent, I believe, had met their burden of proof with regard to torture. Which case is that? Kamara, which is the Third Circuit. All right. All right. You've cited it probably, right? Yes, 420F 3rd 202. And so if we were to deploy a Kamara type of analysis here, the only thing that's missing, so to speak, from this record is the immigration judge saying there's a 40% risk of torture based upon clan and an 11% risk based upon HIV. And therefore, respondent has met his burden and carries the day. So again, the judge, based upon the credible testimony of the parties and also the credible evidence record, which is voluminous, concluded that the risk of torture persists for him throughout Somalia. I would also point out that the immigration judge's decision at page 75 of the record notes the Department of State, notes that physical abuse of HIV positive individuals with no official response takes place in Somalia. The BIA does acknowledge that. Correct. They do. Well, they do, but yet don't weigh it. I mean, they essentially dismiss it as we're reviewing the standalone claim based upon HIV and physical abuse does not equal torture. Well, those are two different things in terms of what happened here with the immigration judge. She was looking at both the HIV status and the clan membership and concluding that there's a risk of torture. Further, respondent's mother testified about the treatment of HIV positive individuals in Somali society, that they are essentially subject to stoning, that there's essentially impunity for private actors in Somalia because the government also shares the belief that HIV positive people are to be excluded, are unclean, et cetera. I would also note in the immigration judge's decision from page 75, she notes that minority clans face higher rates of violence combined with a lack of access to protection. It is not simply a matter of the judge relying upon an overall state of affairs, an overall state of civil disorder or civil war. Rather, she looked at the individualized evidence presented both in terms of country information and most critically respondent's mother's testimony to conclude that not only is he a member of the Spaghetti clan, but also that the Spaghetti clan lacks access to weapons and that the superior clan, the Digil, will not protect the members of the Spaghetti clan. She also correctly considered all evidence relevant to the possibility of future torture, which again, the BIA makes a scant record, I think, with regard to that. Essentially what we have in the decision from the board is there are findings of fact from the immigration judge. There are points where the board has cited various things in the record, and the board has said, we don't like these things. We don't like what the judge said here. We'd rather look at what's over here and try to disguise it as clear error review. And that's simply not enough. That doesn't meet the clear error standard. That's very improper. What is it? What is the essence of your argument? That the board engaged in impermissible fact finding? Implied the incorrect standard of review because the immigration judge did not engage in de novo fact finding, and also that did not treat our immigration judge's decision as under clear error review. I see. They do begin every paragraph, every, I'm exaggerating, five in a row, I think, or six in a row. But you get my point. Yes. They do begin several by saying clearly errored. Can we really say they've made that mistake when they say that in their topic sentence of the paragraph, five in a row or six in a row? Yes. I think we absolutely can say they clearly erred, and that's under Ramirez's payroll. I mean, it's not sufficient for the government just to say that we applied this standard without evidence of them actually doing so. And, again, what they've done is – What if we just disagree about whether it was clear error? Does that mean they misapplied the clear errors? They didn't apply a clear error standard or – I'm sorry. Could you – I'm sorry. I don't think – are you arguing that if they say there was clear error and we reviewed it, we disagree that there was a clear error, that the board has, therefore, failed to apply the clear error standard? Yes. That's exactly what we're saying. Well, then you're really saying we do de novo review of the board's applications of this clear error standard. Of their legal errors. You would do de novo review of legal error by the board. Of legal error by the board. But that's different from whether we do de novo review of how they apply the clear error standard, isn't it? No, I don't think it is. I don't think – I don't think it is. And even if these were to be merged, I think that that's another reason to hold off on a decision on this pending NASSARALA. Because if NASSARALA, if the Supreme Court decides that fact-finding is also subject to de novo review by a circuit panel, that would, I think, also help to eliminate some of this, perhaps, confusion that is apparent, that appears to be present. But I think if we look at primarily, Your Honors, I mean, again, I would direct you to Ramirez-Pero. And I would direct you to Waldron versus Holder. Which, again, legal errors are de novo review. Frankly, also, Hobbs to Michael versus Ashcroft was remanded because the agency didn't consider all the claims or failed to – failed to apply a proper standard of review in reviewing those claims. And I'd like to reserve the rest of my time for rebuttal. Very well. You may. Ms. Pratt, we'll hear from you. Yes. Good morning, Your Honors. Charisse Pratt for the respondent, William P. Barr. May it please the Court. Your Honors, Mr. Omar has the burden to prove jurisdiction. And there's no question that he was removed pursuant to his criminal convictions. Therefore, the criminal alien, Barr, applies. He failed to exhaust this claim before the Board. Therefore, this Court has no jurisdiction to review his criminal convictions. Therefore, the only issue is whether he has raised a legal question for your review. And whether the Board properly applied clear error review is a legal question. Here, there's no question that the Board looked at each fact found by the immigration judge and made an independent determination whether that fact was supported by the record. And they found that the three facts weren't. One fact goes to the Begadi clan. And they found that the country conditions evidence did not provide any treatment on the Begadi clan members. Therefore, they found that the immigration judge clearly erred with that respect. They also found that the immigration judge erred with respect to whether he would be tortured based on his HIV status. And they said that while there's significant stigma and substantial discrimination, occasional violence, and the access to medical treatment is very limited, that does not arise to torture. And they also found error in the immigration judge's determination that he could not relocate because the record shows that in Mogadishu there's very little clan violence and discrimination. So the record clearly shows that they took each fact found by the immigration judge, looked at it, and determined whether or not it was supported by the record. They, in effect, say there's a lot of hardship but no torture, right? Correct. And we submitted a Rule 28J letter with respect to the court's most recent decision in GEMA, which is very similar, involving a denial of deferral of CAT, although in that case they did raise the issue in supplemental briefing about the criminal connection, whereas here they did not. So if there are no further questions, I would rest on the briefs. What is your position on the motion to hold the case in abeyance pending the Supreme Court litigation? We would oppose that because here your jurisdiction is to look to see whether there was a legal error with respect to the board's application of clear error review. And if you look at that and there was no error, that's the end of the case. I thought her position was the Supreme Court might, in this pending case, be asked to decide whether we also have jurisdiction to review factual matters. But in this case she waived that by not exhausting before the board his removability based on his criminal convictions. You're saying that's the only issue that could be opened up if Nasrallah came out against the government and it's not preserved here? The only issue that they didn't contest anything before the board. So the only issues that are alive are the issues with respect to the board's clear error review. They've said that the immigration judge did everything right. They conceded. You probably already covered this in your argument, but how is this case different from the Waldron case? Oh, okay. In other words, was this a case of a Waldron case? No, this is a case where the board actually said we're looking at clear error analysis. They looked at it step by step. They took each fact that the immigration judge found. They looked at the record to see if there was support. Did they pay lip service to Waldron or did they, in other words, were they being, I won't accuse the board of being disingenuous, but let's say they were disingenuous. No, but actually if you look at the citations that they cited, where they cited to the record, for every fact that they found wasn't supported, they cited to the record, and I could provide those record sites if you'd like. So they didn't do this just whimsically saying we don't like this guy. I shouldn't put it that way. Well, I guess you've made your argument that they looked at the evidence very carefully and said it was not supported by the record and they pinpointed the record sites. Well, suppose we're unconvinced that there was a clear error by the immigration judge. Does that amount to a legal error by the board? Well, if you're unconvinced that the immigration judge erred, then that would be in effect saying that there are two permissible views and that the board engaged in fact-finding. But that's not the case here because the board cites to the record that supports the board's view of the facts rather than the immigration judge. Well, citations by themselves don't mean that the board was correct or that the evidence supports the board's view. Well, but you're not able right now to look at the facts underlying it. If you were, you would see where they cited to people with HIV and Mogadishu, getting treatment at a hospital for free, but you're not supposed to look at the facts, only whether the board properly looked at each fact and then engaged in clear error review. Well, we do have to figure out if there are two permissible views of the evidence, right under the United States Supreme Court standard, the Anderson standard, the board cites it. But there can't be two permissible views if two opposite opinions are, you know, the board supports its views with the record evidence. So there can't be two permissible views. And they say- Well, it depends whether the board's citations support what it says. Right. Why don't you address that? What's the record that supports what the board said about the Klan violence? The Klan violence? That would be- Wasn't that one of the grounds that the IJ relied upon? Yes. Yes. So that would be the record at pages- No, no, I don't mean give me the numbers. I mean tell me what is in the record that you think supports what the board included. Okay. If you have it in mind. Yes. I would have to just turn to the page of the record. Well, like they said, well, they pointed to different facts in the record that show that there's not so much Klan identity these days, but more like networking and who you know, as opposed to having to seek protection based on your Klan membership. They pointed to evidence like that. They pointed to the fact that the Somalian military is active in Mogadishu and is fighting against Al, the militant group. And so they said just because you don't have a family network or a Klan family support or Klan network, that does not arise to torture. All right. Thank you for your argument. Okay. Thank you. Ms. Hunter, we'll hear from you. Yes. Thank you. With regard to the GEMA decision, I would just like to treat that briefly. I would note that at page four of the Westlaw citation, it indicates the BIA highlighted how the IJ did not discuss any motive for the South Sudanese to torture GEMA in that case. Here, the IJ decision is rife with discussion as to the reasons why torture, and again, reasons plural is key because, again, the immigration judge appropriately aggregated the factors in determining the likelihood of torture to Mr. Abdi Omar. I mean, that's under matter of JRPG, which is a board case. We discussed Camara earlier. Again, by the government's presentation today, it focuses on an, quote, unquote, independent determination of each fact by the board, and that is not the legal standard because, again, a torture convention claim rests upon all the factors, the aggregate factors. So in order to go through one by one and state that the immigration judge committed clear error is not correct because that's not what the immigration judge was doing. She was deploying the appropriate standard from the start. Well, but I think if the immigration judge relies on multiple facts to reach its conclusion, isn't the board permitted to look at those facts and see whether they're clearly erroneous? Certainly, the board can look at those facts, but that goes back to Anderson, which just because there are two alternate views of the evidence of record, that does not necessarily lead to a conclusion of clear error. That's true, but they said that some of these facts were, these factual findings were clear error. Right, but they don't, but they offer no analysis of why they're clear error. Again, what the board has done. We have a lot of record citations, and I guess that's what we need to assess. Well, and I think what this evidence is, is the immigration judge found these particular, points out these record sites. The board comes along and says, well, we would like you to look over here instead, but doesn't make the link about why having you look over here is a clear error on the part of the immigration judge. And I think that fact, I mean, again, I think the only thing that could be missing here, potentially, would be if the immigration judge had gone through the Camara analysis and assigned percentages of likelihoods to the two main factors, which are his Klan status and HIV. I would also note that the discussion, again, of Klan dynamics, the power of kinship and so forth, is also addressed by the IJ at page 72 of the administrative record, and I see my time is up. Thank you. Very well. Thank you for your argument. The case is submitted, and the court will file an opinion in due course. Counselor, excused. The court will be in recess for five to ten minutes and then reconvene for the fourth and fifth cases of the day.